# Supreme Court of Texas

No. 23-0460

Jared Bush, Jr.,

*Petitioner*,

v.

Columbia Medical Center of Arlington Subsidiary, L.P. d/b/a
Medical City Arlington and HCA Inc.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Second District of Texas

JUSTICE BLAND, joined by Justice Devine, dissenting.

A person is liable for his own conduct, not another's. When the law recognizes third-party liability, it is limited to special relationships giving one party the right to control another's conduct. By law, hospitals cannot and do not control independent-contractor physicians. The Court, however, decides today that a hospital should be liable for injuries that independent physicians cause, based on an allegation that the hospital failed to develop policies preventing physician negligence.

A Chapter 74 expert report seeking to hold a hospital liable must explain how hospital employees caused the injury to a patient. While

replete with opinions alleging that physician negligence caused a tragic loss of life, the report in this case identifies no conduct by a hospital employee as a contributing cause of the injury. Instead, the report attempts to hold the hospital vicariously liable for the conduct of a physician the hospital does not employ, speculating that the hospital could have prevented the non-employee physician from making a negligent misdiagnosis. Such derivative causation finds no support in Texas law. To the contrary, our Court has squarely held that safety policies—or, as in this case, the alleged lack thereof—do not impose vicarious liability for the negligent acts of independent contractors.

With hindsight and the aid of the majority's opinion, future experts will testify in every medical malpractice case that a hospital policy could have prevented a doctor's negligence. Affording merit to hindsight opinions lacking specific causation will make hospitals guarantors of nonemployee conduct. Such a holding undermines Chapter 74's fundamental purpose, which is to focus healthcare liability claims on the pursuit of truly culpable defendants.

Because the report in this case points to no hospital-employee conduct as a contributing cause of the injury to the patient, it does not satisfy Chapter 74's causation requirement with respect to the hospital defendants. The Court should affirm the court of appeals' judgment. As it does not, I respectfully dissent.

# I

The report alleges that the Hospital breached the standard of care "by failing to have appropriate polices [sic], protocols and procedures in place, by failing to appropriately train providers and interdisciplinary

2

teams and/or failing to enforce appropriate polices [sic], protocols and procedures." Specifically, the Hospital should have adopted a "Triple Rule Out" protocol, in which "critical cardiac pathologies, including aortic dissection, pulmonary embolism and coronary artery disease, are appropriately considered, investigated and ruled out in every hospital patient presenting with signs and symptoms similar to those in this matter." Had such a protocol been in place, the report speculates, Williams-Bush's doctors would have properly diagnosed her condition and prevented her death.

The report does not, however, even obliquely identify or link a hospital employee's failure to properly treat Williams-Bush to a cause of her injury, merely reiterating that a policy would have led to a proper physician diagnosis:

> Had Medical City Arlington developed, implemented, trained, and enforced appropriate acute cardiovascular polices [sic], protocols and guidelines, all physicians, nurses and medical staff would have been required to follow protocols to ensure that appropriate imaging and lab work were performed. In reasonable medical probability, this would have confirmed the presence of the massive bilateral pulmonary embolism while Mrs. Bush was in the hospital and at a time when appropriate and life-saving intervention could have easily been undertaken, such as blood thinning medication, thrombolytic and/or surgical intervention.

The court of appeals rejected the expert report as to the Hospital because it was conclusory as to causation, leaving "too many analytical gaps in explaining how the allegedly proper policies, procedures, and

3

protocols would have been implemented, in a timely fashion, to save the decedent's life."[1]

## II

Chapter 74 resulted from the Legislature's determination that claims against healthcare providers had risen "inordinately," resulting in a "material adverse effect on the delivery of medical and health care in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future."[2] Texas patients faced increased medical care costs, both "directly through fees and indirectly through additional services provided for protection against future suits or claims."[3] Such "defensive medicine" raised costs for patients, insurers, and the state, contributing to inflation in the healthcare sector.[4]

Enacted against this backdrop, the 2003 Medical Liability Act strengthened the expert report requirement for health care claims. Chapter 74's "expert-report requirement seeks 'to deter frivolous lawsuits by requiring a claimant early in litigation to produce the

---

[1] 692 S.W.3d 606, 614 (Tex. App.—Fort Worth 2023). The court of appeals also ventured that holding the Hospital responsible for a misdiagnosis would violate laws prohibiting the corporate practice of medicine. *Id.* at 612–13. Regardless, however, it concluded that the report did not connect the Hospital's conduct to a contributing cause of injury. *Id.* at 614.

[2] Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847, 884.

[3] *Id.*

[4] *Id.*

opinion of a suitable expert that his claim has merit.'"[5] The fundamental goal is "to make health care in Texas more available and less expensive by reducing the cost of health care liability claims."[6]

Chapter 74 thus requires "a written report by an expert that provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."[7] While the report "need not marshal all the plaintiff's proof," it must include an expert's opinion on each of these requisite elements to confirm that a claim against a particular defendant is not frivolous.[8] An expert must provide sufficient information to: (1) "inform the defendant of *the specific conduct* the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit."[9] Absent this information, the report fails to provide a fair summary of the expert's opinions.[10] If the plaintiff's report does not muster this bare information, the trial

---

[5] *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011)).

[6] *Scoresby*, 346 S.W.3d at 552 ("'[E]liciting an expert's opinions early in the litigation [is] an obvious place to start in attempting to reduce frivolous lawsuits' and thereby reduce the costs of claims." (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001))).

[7] Tex. Civ. Prac. & Rem. Code § 74.351(r)(6).

[8] *Palacios*, 46 S.W.3d at 878.

[9] *Id.* at 879 (emphasis added).

[10] *Id.* at 878.

court must dismiss the non-meritorious case before the defendant incurs the burden of expensive discovery and trial.[11]

The challenged element in this case is causation. To show causation at this preliminary stage, Chapter 74 requires, if not proof, an explanation of how the breach caused the injury.[12] Otherwise, an expert's causation opinion is mere *ipse dixit*.[13] The expert's report must touch on causation's two components: foreseeability and cause-in-fact.[14] The expert must opine that the act or omission was "a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred."[15] Ultimately, expert testimony on causation must demonstrate either specific causation—that a plaintiff's injuries were factually caused by the defendant's negligence—or an "appropriately strong associational finding" demonstrating the plaintiff's situational similarity to those in scientific studies relied upon and ruling out other plausible causes of the injury.[16]

---

[11] *Id.* at 877.

[12] *Zamarripa*, 526 S.W.3d at 460.

[13] *Id.*

[14] *Id.*; *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013).

[15] *Rodriguez-Escobar*, 392 S.W.3d at 113.

[16] *See Bustamante v. Ponte*, 529 S.W.3d 447, 460 (Tex. 2017) (considering the application of specific causation requirements in the toxic tort context under *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997), to a medical malpractice case).

## III

The expert's theory of causation in this case is simple to understand but impossible to uphold: the Hospital should have had a policy that would have prevented co-defendant Dr. Sohail, one of the physician cardiologists who treated Williams-Bush, from misdiagnosing Williams-Bush. The appeal is sheer pathos: *someone* should have stopped this doctor from allegedly making a tragic mistake. Liability arising through control over another is vicarious liability; no incantation of "direct liability" can make it otherwise.[17]

Neither policies, nor a lack thereof, should impose liability on a hospital for an independent contractor's conduct. Endorsing hypothetical policies as a basis for hospital liability for independent physician negligence opens the door to holding hospitals liable in nearly every medical malpractice context because it removes a required showing that the hospital's agents caused the injury.

## A

The general rule is that no person has a duty to control another's conduct, and therefore cannot be liable for the torts of another.[18] However, if a principal has the right to control its agent, then Texas law

---

[17] *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541–42 (Tex. 2002) ("Under the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an agent or employee acting within the scope of his or her agency or employment, although the principal or employer has not personally committed a wrong." (quoting *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998))).

[18] *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009).

recognizes that the principal may be vicariously liable for the agent's conduct.[19]

Standing alone, policies do not create the control that gives rise to vicarious liability. Our Court expressly held so decades ago in *Hoechst-Celanese Corp. v. Mendez*.[20] Mendez was an employee of Mundy, a Celanese contractor.[21] Mendez sued Celanese for personal injuries, claiming that Celanese's inadequate policies demonstrated sufficient control over his work to incur a duty of care.[22] This Court held that general safety guidelines and precautions "did not impose an unqualified duty of care on Celanese to ensure that Mundy employees did nothing unsafe."[23]

---

[19] *Wolff*, 94 S.W.3d at 542.

[20] 967 S.W.2d 354 (Tex. 1998).

[21] *Id.* at 355.

[22] *Id.* at 356.

[23] *Id.* at 357–58. Courts of appeals have similarly held that the existence of safety regulations or policies did not constitute the kind of control required to impose vicarious liability on an entity for the torts of an independent contractor. *See Johnson v. Scott Fetzer Co.*, 124 S.W.3d 257, 266 (Tex. App.—Fort Worth 2003, pet. denied) (holding that a contractual requirement that distributors follow manufacturer's sexual harassment policies did not show sufficient control to impose liability for dealer's harassment on manufacturer); *Victoria Elec. Coop., Inc. v. Williams*, 100 S.W.3d 323, 328, 332 (Tex. App.—San Antonio 2002, pet. denied) (holding utility's contractual right to require independent contractor's compliance with applicable federal, state, and municipal safety laws and codes and utility's safety manual insufficient to impose duty on utility to ensure safety of traveling public while independent contractor transported utility poles on highway).

8

As a necessary corollary, the *lack* of a safety policy also does not create control sufficient to impose vicarious liability.[24] In *Dow Chemical Co. v. Bright*, this Court held that "Dow's failure to implement such a safety rule is not actual control."[25] Dow therefore owed no duty to an injured employee of a Dow subcontractor.[26] In contrast, in *Lee Lewis Construction, Inc. v. Harrison*, we held that the conduct of a company employee who personally inspected the safety gear used by contractors—and thus retained the right to control their work—could be a contributing cause of the injury.[27] The report in this case contains no allegation similar to that in *Lee Lewis*. It does not allege, for example, that a hospital employee who treated Williams-Bush contributed to the physician's injury-causing misdiagnosis.

We addressed expert reports that attempt to attribute physician decisions to a hospital in *Columbia Valley Healthcare System, L.P. v. Zamarripa.*[28] The expert reports in that case identified the decision by an independent contractor physician to transfer a pregnant patient by ambulance as a cause of the patient's death.[29] Neither expert explained how the hospital "had either the right or the means to persuade [the physician] not to order the transfer or to stop it when he did."[30] We

---

[24] *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 609 (Tex. 2002).

[25] *Id.*

[26] *Id.* at 609–10.

[27] 70 S.W.3d 778, 784 (Tex. 2001).

[28] 526 S.W.3d at 461.

[29] *Id.* at 456–57.

[30] *Id.* at 461.

9

concluded that the report failed to demonstrate the causal link between the hospital's actions and the patient's death.[31]

As in *Zamarripa*, there is no indication in the present expert report that the Hospital had either the right or means to control physician decisions so as to impose vicarious liability for them. The decision to transfer a patient, at issue in *Zamarripa*, is not distinguishable from the decision to order diagnostic tests for a patient; both implicate decisions reserved to physicians.[32] Absent a causal connection linking the conduct of a hospital employee as a contributing cause, it is speculative to conclude that a hospital protocol would have prevented the injuries caused by a nonemployee physician's negligence.

The Court attempts to distinguish *Zamarripa* by stating that a policy would have communicated vital diagnostic information leading to an accurate diagnosis by the physician.[33] But the report does not identify a hospital employee in possession of such information who failed to deliver it to a physician. As much easily could be said about information provided before transporting the patient in *Zamarripa.* Neither the Court nor the report hazards what information the Hospital was charged with providing and failed to provide, or how the Hospital

---

[31] *Id.*

[32] *See Doctors Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 548 (Tex. 2016) ("[O]nly a licensed doctor can provide medical care."); Tex. Civ. Prac. & Rem. Code § 74.001(a)(19) ("'Medical care' means any act defined as practicing medicine . . . ."); Tex. Occ. Code § 151.002(13) (defining "[p]racticing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or . . . injury").

[33] *Ante* at 22.

might enforce its policy against Dr. Sohail such that he would have avoided his own alleged malpractice. The theory is no different than similar allegations this Court rejected in *Mendez, Bright,* and their progeny.[34]

**B**

The Court responds that its newly adopted theory of control-by-policy is not vicarious liability because the policy is meant to control not Dr. Sohail, but unspecified Hospital employees. These employees should have done *something* differently—the report does not say what—that would have somehow nudged, but not controlled, Dr. Sohail into a different diagnosis for a seriously ill patient. As *Zamarripa* held, without the right of control, the effect of a hospital policy on physicians cannot be presumed.[35] Discounting physician independence, the Court

---

[34] We did not backtrack from years of vigilantly guarding against third-party liability for injuries caused by another in *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 629 (Tex. 2013). Instead, we summarized that "several cases have held that direct and vicarious liability theories involve different sets of operative facts because 'the facts required to establish the defendant's vicarious liability . . . differ from the facts required to establish the . . . defendant's direct liability, i.e., [its] provision of particular policies and procedures.'" *Id.* (quoting *Fung v. Fischer*, 365 S.W.3d 507, 522 (Tex. App.—Austin 2012, no pet.)). A summary of lower court precedent is far different from a holding eradicating the element of proximate cause.

[35] 526 S.W.3d at 461. Texas courts have deemed reports attributing injuries to a lack of policy conclusory when they do not explain how a policy would realistically be enforced—even when the tortfeasor was a hospital employee subject to hospital control rather than a non-employee physician like Dr. Sohail. *See Hendrick Med. Ctr. v. Conger*, 298 S.W.3d 784, 789–90 (Tex. App.—Eastland 2009, no pet.) (rejecting report that "simply declare[d]" that a hospital should have had policies and procedures that would "reduce the likelihood that mistakes will be made," not only because the expert was not qualified but also because his opinions on "the relation of the breach to the

11

opines that while a physician "could conceivably 'opt out' of the protocol," an expert need not rule out every potential defense to causation.[36] The report is defective not because it fails to rule out defenses to causation, but because it fails to establish the basic elements of causation required at this stage for this particular defendant.[37]

The Court's opinion wants it both ways: the Hospital isn't liable for failing to control Dr. Sohail, except that a hypothetical policy would have been so effective at controlling Dr. Sohail that its absence *caused* Williams-Bush's death.

If "lack of a policy" might be a reason a hospital could be liable for physician negligence, then every case of negligent misdiagnosis will be brought against the offending physician *and* the hospital. An expert can always speculate that a policy could have nudged a physician to make a better decision. Analysis based on such hindsight, without specific causation in the form of negligent conduct by a hospital employee, is

---

cause of death are conclusory"); *Hickory Trail Hosp., L.P. v. Webb*, No. 05-16-00663-CV, 2017 WL 677828, at \*7 (Tex. App.—Dallas Feb. 21, 2017, no pet.) (holding that expert report citing hospital's failure to enact policies regarding when staff may enter the rooms of female patients "fails to state how the absence of the listed policies would have kept this particular incident from happening" and concluding that the expert's opinion on causation was conclusory).

[36] *Ante* at 25.

[37] *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 226 (Tex. 2018). A finding of cause in fact cannot be supported by mere "conjecture, guess, or speculation." *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003). Nor can a report merely state the expert's conclusions about the elements of causation. *Palacios*, 46 S.W.3d at 879. An allegation that a hospital's operations are "systems-based," moreover, does not waive these or Chapter 74's statutory requirements.

insufficient.[38] The majority's opinion erodes the causation standard for hospitals and other healthcare entities into something much more akin to strict liability: for every injury based on physician negligence, there is a corresponding hypothetical preventative policy.

## IV

A hospital's negligence must be traceable to "the specific conduct the plaintiff has called into question."[39] Such conduct occurs through the Hospital's agents and employees.[40] The report thus must allege that some Hospital agent or agents caused Williams-Bush's injury as a result of the Hospital's negligent failure to develop an adequate policy.[41]

Pointing to a physician as the cause of an injury is insufficient. A hospital has the right to control the means and methods of the work *of its employees*.[42] Physician independent contractors, in contrast, exercise

---

[38] *See Moreno v. M.V.*, 169 S.W.3d 416, 422 (Tex. App.—El Paso 2005, no pet.) (Finding insufficient an expert report's "hindsight analysis" without any specific evidence of causation).

[39] *Palacios*, 46 S.W.3d at 879.

[40] *See In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 188 (Tex. 2007) ("Corporations can act only through human agents . . . .").

[41] Under vicarious theories of liability, like respondeat superior, and other derivative theories such as negligent hiring, training, or supervision, a plaintiff may hold an employer liable only if the employee's tortious conduct proximately caused injury to the plaintiff. *See Wansey v. Hole*, 379 S.W.3d 246, 247 (Tex. 2012) ("[T]here is a broad consensus among Texas courts that [a negligent hiring] claim requires that the plaintiff suffer some damages from the foreseeable misconduct of an employee hired pursuant to the defendant's negligent practices."). We affirmed this principle in *Endeavor Energy Res., L.P. v. Cuevas*, holding that a negligent hiring, training, and supervision claim requires underlying harmful and negligent conduct by an employee. 593 S.W.3d 307, 311 (Tex. 2019).

[42] *Wolff*, 94 S.W.3d at 541–42.

sole control over the means and methods of their work, and therefore bear sole responsibility for their negligence.[43] Health care organizations are not liable for the negligence of those contractors.[44] In particular, a hospital is not liable for the negligence of a non-employee physician.[45] Rather, when a plaintiff attempts to hold a hospital liable, it must identify conduct by the *hospital's* employees or agents that caused the injury.[46]

The expert report opines that Dr. Sohail breached the standard of care by failing to order imaging, misdiagnosing the pulmonary embolism, and discharging Williams-Bush prematurely. It links Williams-Bush's death to Dr. Sohail's conduct and omissions, opining that "[a]s a direct result of this violation of the standard of care, Mrs. Bush's pulmonary embolism went undiagnosed during hospitalization and following discharge, resulting in her death."

---

[43] *See id.* at 542 ("Indeed, it is the absence of that right of control that commonly distinguishes between an employee and an independent contractor and negates vicarious liability for the actions of the latter.").

[44] *Id.*

[45] *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009); *Sampson*, 969 S.W.2d at 948. A hospital may, however, be vicariously liable through the elements of ostensible agency. *Sampson*, 969 S.W.2d at 948–49.

[46] *See Palacios*, 46 S.W.3d at 879 (explaining that a Chapter 74 report's first requirement is to "inform the defendant of the specific conduct the plaintiff has called into question"); *In re Merrill Lynch*, 235 S.W.3d at 188 ("Corporations can act only through human agents . . . ."). A Chapter 74 report alleging negligence by a hospital, therefore, must point to negligent conduct by the hospital's agents.

The report contains no similar statement that a Hospital employee directed or participated in Dr. Sohail's medical decisions with respect to Williams-Bush or failed to inform him of specific information available to hospital employees and unavailable to him. Neither is there a statement that the Hospital failed to implement standing orders from Dr. Sohail or any physician. The report instead suggests, in short, that the Hospital should have "ensured" that Dr. Sohail did not commit malpractice.[47]

The Court seeks to rescue this defective report by repeatedly suggesting that the expert in this case opined that the Hospital should have had "standing orders" that would have led to Williams-Bush's diagnosis.[48] The report, in fact, does not once mention standing orders.

---

[47] The report's statements about causation are self-referential; none identify care provided by hospital employees: "Medical City Arlington violated the standard of care by failing to have appropriate polices [sic], protocols and procedures in place, by failing to appropriately train providers and interdisciplinary teams and/or failing to enforce appropriate polices [sic], protocols and procedures." Medical City Arlington "violated the standard of care by not having appropriate policies, procedures, guidelines or protocols in place to ensure proper evaluation, assessment, testing, treatment and diagnosis"; "not having, and/or enforcing compliance with, appropriate clinical pathways to ensure appropriate testing is conducted to rule out medical emergencies, such as pulmonary embolism"; and "not having appropriate policies, procedures, guidelines or protocols in place to properly ensure that the etiology of Mrs. Bush's symptomology was properly identified during her hospitalization and prior to discharge." Throughout, the report reiterates the Hospital's alleged failure to have a policy, protocol, or "clinical pathway" that would have led to Williams-Bush's diagnosis.

[48] *Ante* at 22 ("The amended report . . . opines that the Hospital could have changed the outcome by adopting and enforcing policies, such as standing orders to run specified tests on patients presenting with Williams-Bush's symptoms."); *id.* at 15 ("The expert report fairly summarizes Dr. Patterson's opinion as to how and why the Hospital's alleged failure to implement policies

15

The record is devoid of such language. The issue of when and whether a hospital, rather than a physician delegating the performance of a medical act, can establish standing orders is thus not before us. Assuming that it was, the Occupations Code recognizes standing orders as the physician's delegation of medical acts to hospital personnel, not the other way around.[49] A report cannot pass muster under Chapter 74 by attributing to it language and reasoning it does not contain.[50] It is not a court's role to fill a report's analytical gaps with concepts never articulated by the expert who wrote it.

As the court of appeals aptly observed, the report "does not explain how and why Hospital policies, procedures, and protocols—which can be implemented only through its nurses and staff—could have changed what the *physician* did in ordering tests, making his diagnosis, and discharging [Williams-Bush] when she was in stable cardiac

---

such as standing orders to perform appropriate tests for patients presenting with Williams-Bush's symptoms . . . .").

[49] Tex. Occ. Code ch. 157. The Texas Medical Board regulation cited by the Court is not evidence that standing delegation orders are mere "procedures" nor unilateral hospital acts, but rather confirms that a standing order is the act of the delegating physician. 22 Tex. Admin. Code § 169.2(b) ("[S]tanding delegation orders . . . require . . . the order or protocol to be in writing and signed by the delegating physician . . . ."). In giving the broad word "procedures" the technical meaning of written and signed physician orders, the Court significantly alters the substance of the report only to emphasize the identity of the tortfeasor: the *physician* responsible for promulgating standing delegation orders.

[50] *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) ("The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners.").

16

condition."[51] The report fails to explain how the Hospital's conduct caused the injury at the basic level the expert-report stage requires.[52]

Eliding this omission, the Court reiterates its view that "the theory that hospital *administrators* breached a standard of care by failing to adopt the specified policies" is sufficient, standing alone, to establish causation.[53] Any purported breach by an administrator says nothing about how any hospital employee—including an administrator—caused Williams-Bush's injury. Rather, the expert report relies completely on the *physician's* misdiagnosis as the cause of her injuries. The court endorses an inadequate report alleging conduct by an independent physician and "the Hospital" generally, as though hospitals act through an instrumentality other than human bodies and thus must be held strictly liable for policy failures. In doing so, it for the first time recognizes a special category of liability requiring no causal relationship to the defendant's conduct. But an expert report must inform the defendant of *conduct* forming the basis of a claim and make

---

[51] *Columbia Med. Ctr. of Arlington Subsidiary, L.P. v. J.B.*, No. 02-20-00190-CV, 2021 WL 5132535, at *9 (Tex. App.—Fort Worth Nov. 4, 2021, no pet.) In this earlier appeal, the court of appeals rejected this report as conclusory, and Dr. Patterson revised it, but the court of appeals held in the case now before us that the revisions failed to cure the previously identified defects. 692 S.W.3d at 613.

[52] *Zamarripa*, 526 S.W.3d at 460.

[53] *Ante* at 24. Dr. Patterson's report does not specify that Bush's claim is "predicated on the action or inaction of administrators rather than the conduct of a nurse or other medical care provider involved in treating Williams-Bush." *Id.* Even if we agreed that administrator's conduct was the basis of Bush's claim, that would not exempt Dr. Patterson's report from the requirement of explaining how a Hospital actor caused Williams-Bush's injury.

"a good-faith effort to explain, factually, how proximate cause is going to be proven."[54] This report fails to do so.

<p style="text-align:center">*    *    *</p>

The purpose of the Chapter 74 expert report is to swiftly ascertain whether claims alleged against a particular defendant may proceed.[55] The report in this case serves its purpose well: it identifies claims against the physicians that ought to proceed and claims against the Hospital that must be dismissed for lack of causation. The Court endorses the conversion of physician-negligence claims to hospital-negligence claims—claims that, until now, the law has foreclosed. Claims historically dismissed as frivolous will proceed, with Chapter 74 yielding to the passphrase: "policy." Because the report in this case fails to identify Hospital conduct as a cause of the patient's injury, we should affirm the court of appeals' judgment. As we do not, I respectfully dissent.

<div style="margin-left:50%">
_____

Jane N. Bland
Justice
</div>

**OPINION FILED:** May 23, 2025

---

[54] *Abshire*, 563 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460); *Palacios*, 46 S.W.3d at 875.

[55] *Zamarripa*, 526 S.W.3d at 460; *Scoresby*, 346 S.W.3d at 552.